| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY** | |
| Caption in Compliance with D.N.J. LBR 9004-2(c) <br> Nicholas Poduslenko, Esquire <br> Edmund M. George, Esquire <br> Obermayer Rebmann Maxwell & Hippel LLP <br> 1120 Route 73, Suite 420 <br> Mount Laurel, NJ  08054 <br> (856) 795-3300 <br> (856) 482-0504 (fax) <br> *Attorneys for Ron and Rima Seal* | |
| In re: <br><br> MATHEW K. PIERSON <br><br> Debtor. | **Chapter 7** <br><br> **Case No.  21-11080-KCF** |
| RON AND RIMA SEAL <br><br> Plaintiffs, <br><br> v. <br><br> MATHEW K. PIERSON, <br><br> Defendant. | **ADVERSARY NO. 21-1264** <br><br> **PLAINTIFFS' BRIEF IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION TO DISMISS ADVERSARY PROCEEDING PURSUANT TO F.R.C.P. 56, 12(b)(6) and 8(a)(2)** |

I.   **INTRODUCTION**

There are a number of reasons why Matthew K. Pierson's ("Mr. Pierson" or the "Defendant") Motion for Summary Judgment and/or to Dismiss (the "Motion") should be denied, and why Ron and Rima Seal (the "Seals" or the "Plaintiffs") Cross-Motion for Summary Judgment (the "Cross-Motion") should be granted.  First, Defendant disregarded and ignored the clear mandates set forth in Federal Rule of Civil Procedure 56 and this Court's own scheduling order.

Rule 56(b) provides that unless a different time is set by local rule or the court orders otherwise, a party may file a motion for summary judgment at any time until thirty (30) days after the close of all discovery. In this Court's order scheduling pretrial proceedings and trial, the court directed that all fact discovery be completed by October 15, 2021 with all motions being filed no later than thirty (30) days after the completion of all discovery. Defendant has failed to explain why he failed to comply with Rule 56 and this Court's order. For this reason alone, this court should not consider Defendant's motion. The Plaintiffs will rely on the Certification of Rima Seal (the "Seal Certification") attached hereto, in support of this Cross-Motion.

Even if the Court were to consider the Motion, it should be denied. In seeking summary judgement, Defendant entire argument hinges upon a single conclusion made by the trial court with respect to Plaintiffs' invasion of privacy and false light claim in the State Court Action and ignored the specific factual findings made by the trial court with regard to Mr. Pierson, a self-professed high school teacher and educated man who understood the consequences of his actions of not only reviewing the private material of Plaintiffs, but then disseminating false and reprehensible information with regard to Plaintiffs.

Not content with ignoring the findings of fact made by the trial court below, Defendant then misconstrued and misapplied the law regarding the nondischargeability of a debt under 11 U.S.C. § 523(a)(6). While stating the general body of law relating to nondischargeability under § 523(a)(6), Defendant ignores the overwhelming majority of cases where courts have applied the broad view of holding that the "willful and malicious" nature of the injury caused by a debtor's conduct may be inferred from the nature of the act itself. See *In re Jacobs*, 381 B.R. 128, 136 (Bankr., E.D.Pa., 2008). As aptly put by the court in *Jacobs*, the fundamental policy underlying

4888-0524-2636 v2

a bankruptcy discharge is to provide a fresh start only to the "honest but unfortunate debtor." Discharges should be reserved for the "honest and worthy" debtors and should not be misused by debtors such as Mr. Pierson to avoid his reprehensible actions and conduct.

II.     **SUPPLEMENTAL STATEMENT OF UNDISPUTED MATERIAL FACTS**

1. The uncontroverted facts can be found in the trial court's findings of fact and in Mr. Pierson's own words as described herein where Mr. Pierson, the purported boyfriend of Simone Seal, improperly and intentionally inserted himself into a dispute between Simone and her parents, the Seals. *See* Seal Certification ¶1.

2. That dispute arose when Simone, a then 29 year old woman, brought suit against the Seals in the Philadelphia Court of Common Pleas (the "State Court Action") where the trial court (the "PA State Court") found fully in favor of Seals on all of Simone's claims against the Seals. *See* Seal Certification ¶2.

3. In addition to defending against the claims brought by Simone in the state court action, the Seals brought third-party claims against Mr. Pierson, alleging that Mr. Pierson had published false information about the Seals that was highly offensive and reprehensible to any reasonable person. *See* Seal Certification ¶3.

4. The basis for the claim against Mr. Pierson included the fact that Simone and Mr. Pierson, after spending the July 4th weekend at the Inner Harbor with the Seals, traveled back to the Seals personal residence and stayed at the Seals' personal residence without the Seals' knowledge and consent. *See* Seal Certification ¶4.

5. During Mr. Pierson's unpermitted stay at the Seals' residence, he and Simone Seal went through personal files of the Seals, including personal calendar books, ledgers and journals of

4888-0524-2636 v2

Mrs. Seal, tax documentation, employment documents, and bank statements. Mr. Pierson admitted in the State Court Action that he had no right to review the personal items.[1] *See* Seal Certification ¶5.

6. After Mr. Pierson improperly reviewed the private material and documentation of the Seals, he began a campaign of publicizing and disseminating to third persons reprehensible, baseless accusations regarding the Seals, which were designed to harm their reputation and standing in the community and personally humiliate and embarrass them. *See* Seal Certification ¶6.

7. Those accusations were disseminated and publicized both verbally and through texts Mr. Pierson sent. *See* Seal Certification ¶7.

8. Among the ***reprehensible and baseless*** accusations disseminated by Mr. Pierson regarding the Seals (the majority of which was established at trial through Mr. Pierson's own texts and admissions) were that[2]:

    a)    While married, Mrs. Seal was involved with other men where she would use them for personal gain. *See* Exhibit "A;

    b)    Mrs. Seal had Simone kidnapped when she was a child, where the natural father was "dead" within three weeks of a kidnapping case being filed,[3] that the Seals were under investigation by District Attorney and the Federal Bureau of Investigation, that they would be tried "soon" and be imprisoned for life, and they intended to kidnap their granddaughter, Mariah. *See* Exhibit "B," State Court Findings of Fact at ¶163(a);

---

[1] In a text, Mr. Pierson stated that the documents had been taken from a "locked" part of Mrs. Seal's desk as well as a giant trunk in the basement. *See* Exhibit "A."

[2] Mr. Pierson's dissemination of private information relating to the Seals began only a day or two after he had gone to the house under false pretenses and at a time when he had only met the Seals on a handful of occasions.

[3] None of the statements were true. To the contrary, Mrs. Seal and Simone's biological father were separated during which time, Mrs. Seal was residing in Pennsylvania where she had custody of Simone, and Mr. Bruce V. Hill was a City of Alexandria police officer who died in 1991 from cardiomyopathy shortly after being involved in a foot chase with a suspect.

4888-0524-2636 v2

    c)      Just over a day after taking the personal material of the Seals from their home, informing the Seals' son that "both of [his] parents were going down." *Id.* at ¶163(b);

    d)      Informing the Seals' niece, Kristen Formosa, that the district attorney in Virginia was pursuing a criminal case against the Seals involving financial crimes by Mrs. Seal, and that the authorities were using the state court action brought against him to collect evidence. *Id.* at ¶163(c);

    e)      Mr. Seal had committed tax fraud. *Id.* at ¶163(c);

    f)      Mrs. Seal had conspired with her former husband's (Simone's biological father) brother to have her former husband murdered. *Id.* at ¶163(d);[4]

    g)      Mrs. Seal had defrauded Simone out of millions of dollars; that Mrs. Seal used to "beat the shit" out of Simone; that the Seals were backed into a corner. *Id.* at ¶163(e); and

    h)      Mrs. Seal is a horrendous human being and terrible, terrible, terrible person, that the Seals were going to try to use the granddaughter, Mariah, to **** everything up, that the Seals are going to try to **** with Mariah's father, and the Seals were backed into a corner. *See* Exhibit "D."

*See* Seal Certification ¶8.

9.     After a full trial where Mr. Pierson was represented by counsel, the PA State Court found that Mr. Pierson, who touted himself as a high school teacher and educated man who should understand the consequences of his actions, published false information about the Seals such as:

    a)      stating to Simone's daughter's father that Mrs. Seal kidnapped Simone when she was a child, that Simone's biological father was "dead within three weeks of a kidnapping case being filed," that the Seals were under investigation by the District Attorney and the Federal Bureau of Investigation, that they would be tried "soon" and be imprisoned for life, and that the Seals intended to kidnap Simone's daughter (the Seals granddaughter);

---

[4] In that particular text, Mr. Pierson stated that Mrs. Seal had conspired with her brother-in-law to have her former husband murdered because he was worth a ****load of money dead. *See* Exhibit "C."

  b)  stating to the Seals' son, that they were "going down" and that Mrs. Seal took money from Simone;

  c)  stating to Mr. Seal's niece that the District Attorney in Virginia was gathering evidence against the Seals and was using the state court action to bring charges, that Mrs. Seal had committed financial crimes, and that Mr. Seal committed tax fraud;

  d)  stating to Mr. Seal that his wife had conspired to have Mr. Bruce V. Hill murdered;

  e)  stating that Mrs. Seal defrauded Simone out of millions of dollars, that she "beat the shit out of" Simone, and that Simone had a Protection From Abuse Order in place against the Seals; and

  f)  stating to the Seals' granddaughter, that they had lied to Simone and stolen money from her.

Exhibit "B," at ¶163, *See* Seal Certification ¶9.

  10.  The PA State Court specifically found that *any* one of the above statements would be "highly" offensive to a reasonable person where, the given nature of the reprehensible statements, the Seals sustained damage to their reputation, standing in the community, and personal humiliation. Exhibit "B" at ¶164, *See* Seal Certification ¶10.

  11.  At trial, on cross-examination, Mr. Pierson admitted he had no facts or evidence to support any of the statements made. *See* portions of trial transcript attached hereto as Exhibit "E," at pp.180-182, *See* Seal Certification ¶11.

  12.  In relation to one particular text, Mr. Pierson said that Mrs. Seal had conspired with her former husband's brother to have him murdered because he was worth a **** load of money dead, where he advised that the FBI and the state of Virginia District Attorney were coming after the Seals. *See* Seal Certification ¶12.

4888-0524-2636 v2

13. When asked whether he agreed that would be something that would worry someone to whom he made such statement, Mr. Pierson's response was "I would hope it would worry someone. It is a worrying thing." Exhibit "E," at pp.181- 183, See Seal Certification ¶13.

14. At deposition, Mr. Pierson was asked about his text that Simone was kidnapped from her father and then he was dead within 3 weeks of a kidnapping case being filed. Mr. Pierson agreed that he was telling others that Mrs. Seal had her former husband killed and that it was "okay" to be telling others that Mrs. Seal killed her former husband despite having no evidence. When asked if such baseless claims were damaging to Mrs. Seal, Mr. Pierson callously responded "Ask her." See Seal Certification ¶14.

15. When asked if he needed to have facts to support such a claim, Mr. Pierson responded "I guess we'll see" where he refused to provide a single fact. In his own words, Mr. Pierson said "I'm not going to." See portions of Mr. Pierson's deposition transcript attached hereto as Exhibit "F," at pp. 219-222, See Seal Certification ¶15.

### III. LEGAL STANDARD

Pursuant to Rule 56(c), summary judgment should be granted when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. The standard for evaluating a motion for summary judgment under *Fed. R. Civ. P. 56* is well established and has been stated in numerous written opinions. E.g., *In re Klayman, 333 B.R. 695 (Bankr. E.D. Pa. 2005)*; *Lacheen v. IRS (In re Lacheen), 2005 Bankr. LEXIS 868, 2005 WL 1155257 (Bankr. E.D. Pa. Apr. 28, 2005)* (per Sigmund, Ch. J.); *In re Lewis, 290 B.R. 541*

4888-0524-2636 v2

*(Bankr. E.D. Pa. 2003)* (per Carey, J.); *In re Newman, 304 B.R. 188 (Bankr. E.D. Pa. 2002)* (per Fox, Ch. J.).

Before a motion for summary judgment may be granted, the court must find that the motion alleges facts which, if proven at trial, would require a directed verdict in favor of the movant. *See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993)*. If the movant meets this initial burden, the responding party may not rest on his or her pleadings but must designate specific factual averments through the use of affidavits or other permissible evidentiary material that demonstrate a triable factual dispute. *Celotex v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-50, 106 S.Ct. 2505, 2510-11, 91 L. Ed. 2d 202 (1986)*. Such evidence must be sufficient to support a jury's factual determination in favor of the nonmoving party. Id. Evidence that merely raises some metaphysical doubt regarding the validity of a material facts is insufficient. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986)*. In considering the evidentiary matter submitted in support and in opposition to a summary judgment motion, the court's role is not to weigh the evidence, but only to determine whether there is a disputed, material fact for determination at trial. *Anderson, 477 U.S. at 247-50, 106 S. Ct. at [*136] 2510-11*. A dispute about a "material" fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id. at 248, 106 S.Ct. at 2510*. All reasonable inferences must be drawn in favor of the nonmoving party and against the movant. *United States v. 717 South Woodward Street, 2 F.3d 529, 533 (3d Cir. 1993)*.

8

## IV. ARGUMENT

This Court should not consider Defendant's Motion for Summary Judgment and Rule 12(b)(6) Dismissal as he disregarded not only Rule 56, but this Court's scheduling order requiring that any motions be filed thirty (30) days after the completion of discovery. The court's scheduling order succinctly provided that all discovery was to be completed by October 15, 2021 with all motions being filed no later than thirty (30) days after the completion of all discovery. Defendant has provided no explanation as to why he failed to comply with the court's clear directive.

Even if the court were to consider the motion, this Court should deny the motion. Defendant seeks to misuse the Bankruptcy Code and, in particular, §523(a)(6) to avoid his reprehensible conduct based upon the use of a single legal conclusion of law by the PA State Court regarding the claim of invasion of privacy and false light. In doing so, Defendant ignores the specific factual findings relating to Mr. Pierson's reprehensible dissemination of false information regarding the Seals for purposes of harming their reputation and standing in the community and personally humiliating and embarrassing them.

There is no dispute that §523(a)(6) of the Bankruptcy Code provides that a Chapter 7 discharge does not discharge an individual debtor from a debt for "willful and malicious injury by the debtor." As stated by the court in *In re Jacobs*, 381 B.R. 128, 136 (Bankr.E.D.Pa.2008), the overwhelming majority of courts have applied the broad view that the "willful and malicious" nature of the injury caused by a debtor's conduct may be inferred from the nature of the act itself. Under this view, malice can be inferred from the deliberate conduct that "necessarily produces harm or which has a substantial certainty of causing harm without just cause or excuse. Likewise, the courts have applied an objective approach where an injury is willful for purposes of §523(a)(6) if the debtor subjectively intended to cause injury or there was an objective, substantial certainty

9

of injury as a consequence of his or her deliberate action. Emphasis is placed under this approach on the assessment of the factfinder of the likelihood of injury instead of the debtor's knowledge or belief. *In re Jacobs, citing In re Conner, 302 B.R. 509, 514 (Bankr. W.D. Pa. 2003).*

In *Jacobs*, the underlying State Court Action involved multiple causes of actions against the debtor including breach of fiduciary duty. The trial court made specific findings with regard to the debtor and then found that the debtor had breach its fiduciary duty. After filing for bankruptcy and during the course of adversary proceeding the creditor, Viener, asserted that the judgment entered against the debtor was not dischargeable under §523(a)(6). The debtor asserted that the state court judgment for breach of fiduciary duty, by itself, could not support a finding of nondischargeability under §523(a)(6).

In rejecting the debtor's argument, the court found that the debtor had misapprehended and misunderstood the analytical methodology to be employed by the court in determining nondischargeabilty under §523(6). The court found that the analysis was not merely based on the trial court's determination that the debtor had breached his fiduciary duty but, rather, the detailed findings made by the trial court. In doing so, the court considered the trial court's specific factual findings and, accepting them as true, determined on its own whether the findings established the elements of nondischargeability. Upon reviewing the specific factual findings, the court found that the debt arose from an injury to Viener that was (1) willful, (2) malicious and (3) intended or substantially certain to cause injury.

Just as in *Jacobs,* this Court is not limited to merely reviewing the trial court's legal determination of invasion of privacy but must review the detailed findings made by the PA State Court in determining whether its specific factual findings establish the elements of nondischargeability under §523(a)(6). When reviewing the reprehensible statements made by Mr.

Pierson, it is hard to imagine how anyone could find that those statements were anything other than willful and malicious. When applying the objective approach, there was objective, substantial certainty of injury as a consequence of Mr. Pierson's disseminating statements such as Mrs. Seal had her former husband killed because he was worth a **** load of money; that the Seals were under investigation by the district attorney and FBI where they would be tried "soon" and be imprisoned for life; that the Seal had committed financial crimes and committed tax fraud. This is not a situation where a party took some reckless action they should have not taken where they later regret taking such action, but deliberate tortious conduct that was simply designed to harm the Seals.

Even if a subjective approach was applied, Mr. Pierson acknowledged at trial that his texts were designed to worry others. In particular, when asked about a text he sent that Mrs. Seal conspired to have her former husband murdered and that the FBI and the State of Virginia's District Attorney were coming after the Seals, Mr. Pierson admitted that he "hoped" it would worry the recipient. In his own words at trial, Mr. Pierson stated "I would hope it would worry someone." *See* Exhibit "E," Trial Transcript at pp.181- 183. At deposition, Mr. Pierson was asked about a text he sent where he told the recipient that Simone was kidnapped from her father and then he was dead within three (3) weeks of a kidnapping case being filed. Mr. Pierson agreed that he was telling others that Mrs. Seal had her former husband killed, and that it was "okay" to be telling others that Mrs. Seal killed her former husband despite having no evidence. When asked if such baseless claims were damaging to Mrs. Seal, Mr. Pierson callously responded "Ask her." When asked if he needed to have facts to support such a claim, Mr. Pierson responded "I guess we'll see" where he refused to provide a single fact. In his own words, Mr. Pierson said "I'm not going to." See portions of Mr. Pierson's deposition transcript attached hereto as *See* Exhibit "F," Pierson Deposition at pp. 219-

11

4888-0524-2636 v2

222. Just by way of these few examples, Mr. Pierson purposely intended that others would be affected by these outrageous and reprehensible statements regarding the Seals. From any perspective or standard, there was substantial certainty of injury to the Seals as a consequence of Mr. Pierson's deliberate actions.

However, summary judgment is warranted in favor of the Seals as there is no genuine issue that Mr. Pierson's actions were willful and malicious. Pursuant to F.R.C.P. 56(f), this Court may consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute. The above facts are not in dispute as they are Mr. Pierson's own texts, words, and testimony.

Defendant's claim in the Motion that the complaint states conclusory and factually incorrect allegations fares no better, as the complaint identifies the specific willful and malicious actions committed by Mr. Pierson at paragraphs 11 through 17 of the complaint. *See* Complaint, attached hereto as Exhibit "G."

For these reasons, Plaintiffs respectfully request that this Court review not only the trial court's factual findings, but all of the reprehensible statements made by Mr. Pierson regarding the Seals. Upon review of such information and evidence, Plaintiffs respectfully suggest that the Court will find that Mr. Pierson's conduct falls within the willful and malicious exception where the state court judgment entered against Mr. Pierson is not dischargeable. For these reasons, the Seals respectfully request that the Motion be denied, and the Cross-Motion be granted, and an order for summary judgment be entered in their favor.

                Respectfully submitted,

                **OBERMAYER REBMANN MAXWELL & HIPPEL**

By:  */s/ Nicholas Poduslenko*

4888-0524-2636 v2

                                              Nicholas Poduslenko, Esquire
                                              *Attorney for Plaintiffs*
                                              *Ron and Rima Seal*

Dated: February 22, 2022

4888-0524-2636 v2