# EXHIBIT B

Court of Common Pleas Philadelphia County
Trial Division - Civil

# TRIAL WORK SHEET

| Judge's Name: | Judge's I.D.: | Signature: |
|---|---|---|
| **GLYNNIS HILL** | J438 | *[signature] Glynnis D. Hill J438* |

Report Generated 09-JUN-20 Job #55174

| Caption: | Case Type: | Program: |
|---|---|---|
| **SEAL VS VANHILL SEAL ETAL** | FRAUD | MAJOR NON JURY STANDARD |

| Court Term and Number: | If Consolidated, Court Term and Number: |
|---|---|
| **#1711-01173** | |

| Trial Date: | | Total Amount: | Number of Days: | Disposition Date: | Date Sheet Prepared: |
|---|---|---|---|---|---|
| 25-OCT-2019 | ☐ Jury  ☒ Non-Jury | $8,004.00 | 8 | 08-JUN-2020 | 09-JUN-2020 |

Full Description of Disposition (to be entered Verbatim on the Docket)

The Court found that the Plaintiff, Simone Seal, committed the tort of Invasion of Privacy by False Light against the Defendants, Ron Seal and Rima Van Hill Seal. The Court also found that the Plaintiff committed the tort of Conversion against the Defendants.

Relating to the tort of Invasion of Privacy by False Light, the Court entered judgment for the Defendants, Ron Seal and Rima Van Hill Seal, and against the Plaintiff, Simone Seal, in the amount of $2,002 ($1,001 to be paid to each Defendant). Relating to the tort of Conversion, the Court entered judgment for the Defendants and against the Plaintiff and awarded nominal damages in the amount of $2 ($1 to be paid to each Defendant).

The Court also found that the Third Party Defendant, Matthew Pierson, committed the tort of Invasion of Privacy by False Light against the Defendants, Ron Seal and Rima Van Hill Seal. The Court entered judgment in favor of the Defendants, and against the Third Party Defendant, in the amount of $6,000 ($3,000 to be paid to each Defendant).

| | | |
|---|---|---|
| ☐ Default Judgment/Court Ordered | ☐ Jury Verdict for Plaintiff | ☐ Other (explain) |
| ☐ Directed Verdict | ☐ Jury Verdict for Defendant | |
| ☐ Discontinuance Ordered | ☐ Mistrial | |
| ☐ Transferred to binding arbitration | ☐ Hung Jury | Seal Vs Vanhill Seal Et-WSFFD |
| ☒ Finding for Defendant (Non-Jury) | ☐ Non-Pros entered | |
| ☐ Finding for Plaintiff (Non-Jury) | ☐ Non-Suit entered | 17110117300209 |
| ☐ Damages Assessed | ☐ Settled prior to assignment for trial (Team Leaders, only) | |
| ☐ Judgment entered by agreement | | |

TRIALWS REV 6/5/17

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL SECTION**

| | | |
|---|---|---|
| **SIMONE A. SEAL**<br>    **Plaintiff,** | : | |
| | : | |
| **VS.** | : | |
| | : | **NOVEMBER TERM, 2017** |
| **RIMA VANHILL SEAL, ET AL.**<br>    **Defendants,** | : | **No. 01173** |
| | : | |
| **VS.** | : | |
| | : | |
| **MATTHEW PIERSON**<br>    **Third Party Defendant.** | : | |
| | : | |

## ORDER

AND NOW, this 8th day of June, 2020, upon consideration of the competent and credible evidence introduced during the non-jury trial, and based upon the foregoing findings of fact and conclusions of law, it is hereby ORDERED and DECREED that pursuant to Pa.R.C.P. 1038, a non-jury verdict is entered in favor of the Defendants, Rima Van Hill Seal and Ron Seal, and against the Plaintiff, Simone A. Seal, in the amount of $2,002.  The Plaintiff is ordered to pay $1,001 to Defendant Rima Van Hill Seal and $1,001 to Defendant Ron Seal.

It is further ORDERED and DECREED that the Plaintiff, Simone A. Seal, shall return to the Defendants all items taken from the Defendants' home at 1 Palmer Drive, Glen Mills, PA within 30 days of this Order.

It is further ORDERED and DECREED that a non-jury verdict is entered in favor of the Defendants, Rima Van Hill Seal and Ron Seal, and against the Third Party Defendant, Matthew Pierson, in the amount of $6,000.  The Third Party Defendant is ordered to pay $3,000 to Defendant Rima Van Hill Seal and $3,000 to Defendant Ron Seal.

BY THE COURT:

DATE: _Jvne 8 , 2020_

_Glynnis D. Hill_
HONORABLE GLYNNIS D. HILL

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL SECTION**

| | | |
|---|---|---|
| **SIMONE A. SEAL** | : | |
| **Plaintiff,** | : | |
| | : | |
| **VS.** | : | |
| | : | **NOVEMBER TERM, 2017** |
| **RIMA VANHILL SEAL, ET AL.** | : | |
| **Defendants,** | : | **No. 01173** |
| | : | |
| **VS.** | : | |
| | : | |
| **MATTHEW PIERSON** | : | |
| **Third Party Defendant.** | : | |
| | : | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**I.    FACTS**

1.  The trial in this matter occurred on October 25, 2019.  In support of her case in chief, the Plaintiff testified on her own behalf, as well as presented the testimony of Arthur Czabka, a records custodian for Morgan Stanley.  She also introduced 27 documentary exhibits as evidence.  In opposition, the Defendants Ron Seal and Rima Van Hill Seal testified on their own behalf and presented the testimonies of J. Wright Leonard, a handwriting expert, and Jaclyn Kennelly, a notary.  The Defendants also presented approximately 270 documentary exhibits as evidence.  Lastly, on the cross-claim, Third Party Defendant Matthew Pierson testified on his own behalf.

2.  As per the evidence, the Plaintiff, Simone A. Seal, was born Simone A. Van Hill on December 29, 1987 to Defendant Rima Van Hill Seal and Bruce Van Hill.

3.  Defendant Rima Van Hill Seal divorced Bruce Van Hill in **1990** and moved to Delaware County, Pennsylvania, with her daughter, the Plaintiff.

4. Defendant Rima Van Hill Seal and Defendant Ronald Seal married in 1991.

5. The Plaintiff's natural father, Bruce Van Hill, was a police officer for the city of Alexandria, Virginia.

6. On July 29, **1992**, Bruce Van Hill died of hypertrophic cardiomyopathy (i.e. an enlarged heart).

7. In 1995, Defendants Ron and Rima Seal legally changed the Plaintiff's last name to Seal.

8. The Plaintiff lived with the Defendants Ron and Rima Seal and their son Austin at 1 Palmer Drive, Glen Mills, Pennsylvania, throughout the Plaintiff's preteen and high school years.

9. In 2000, **Defendant Rima Van Hill Seal** opened a **Uniform Gift to Minor Account** with Morgan Stanley, **naming the Plaintiff as the beneficiary** and herself as Custodian. See Exhibit P-22. See also paragraphs 94-102 of these Findings, *infra*.

10. The Plaintiff attended high school at Padua Academy, a private all-girls school in Wilmington, Delaware, where she graduated in June, 2006.

11. On November 28, 2005, the **Social Security Administration** sent a letter to the Plaintiff stating that she would qualify for **survivorship benefits** as a child student starting in January, 2006. See Exhibit P-15. Defendant Rima Van Hill Seal testified that she discussed the survivorship benefits with the Plaintiff. She further testified that the Plaintiff signed a form confirming her graduation date and took it to her high school, which, in turn, sent it to the Social Security Administration on the Plaintiff's behalf.

12. The Plaintiff turned 18 on December 29, 2005.

13. Between January and June 2006, The Social Security Administration sent the Plaintiff monthly payments of $1,114.00. **Defendant Rima Van Hill Seal testified that she**

deposited these Social Security checks into a Social Security Rep-Payee account
(Account #4770) in the Plaintiff's name. See Exhibit P-17.

14. In 2006, the Plaintiff and her parents, the Defendants Ron and Rima Seal, began looking
for ways to pay for her college education.

15. Defendant Rima Van Hill Seal testified that she learned that the Plaintiff was eligible for
death benefits relating to Bruce Van Hill's employment as a police officer for the City of
Alexandria, Virginia in the spring of 2006. See Exhibit D-16, D-21.

16. **On May 3, 2006, the Plaintiff was copied on an email Defendant Rima Van Hill Seal
sent to Connie Jones relating to these Line of Duty death benefits**. See Exhibit D-16.

17. In May 16, 2006, a Claim for Death Benefits pursuant to the Virginia Line of Duty Act
was filed with the Commonwealth of Virginia. **The claim was signed by the Plaintiff**.
See Exhibit P-6.

18. In the fall of 2006, the Plaintiff began attending James Madison University in
Harrisonburg, Virginia.

19. The Plaintiff initially received an annual $5,000 scholarship grant towards her tuition
from the National Law Enforcement and Firefighters Children's Foundation. However,
the scholarship was contingent on the Plaintiff maintaining a certain grade point average.
When the Plaintiff failed to keep her grade point average, she lost her scholarship. All
total, she only received the initial $5,000 from the Foundation.

20. On September 18, 2006, **Defendant Rima Van Hill Seal sent an email to the Plaintiff
requesting her email address to "send her the Alexandria stuff."** See Exhibit D-17.
The Plaintiff responded with a P.O. Box in Harrisonburg, Virginia.

3

21. On September 21, 2006, **Officer Kirtley sent a letter to the Plaintiff** identifying himself as a background investigator for the Virginia State Police and requesting information about her father (Bruce Van Hill) so that the Plaintiff's line of duty death benefit claim could be completed.  **He also requested that the Plaintiff meet with him so that she could sign a Release of Information Form**.  See Exhibit D-251.

22. On October 10, 2006, **the Plaintiff sent Officer Kirtley a signed letter providing the requested information**.  See Exhibit D-18.

23. On October 31, 2006, the **Plaintiff signed** the Authorization for Release of Information Form that Officer Kirtley also requested.  The Plaintiff testified that she **also had the form notarized**.  See Exhibit D-26, P-2.

24. On December 18, 2006, Defendant Rima Van Hill Seal told the Plaintiff that she needed to call Kirtley back or they would "never get anywhere."  See Exhibit D-19.  On January 17, 2007, the Plaintiff sent an email to Defendant Rima Van Hill Seal verifying that she "finally spoke to that officer from [Virginia]."  See Exhibit P-20.

25. On January 30, 2007, the Commonwealth of Virginia sent the **Plaintiff** a payment of benefits under the Line of Duty Act in the amount of **$25,000**.  See Exhibit P-5.

26. Defendant Rima Van Hill Seal testified that she deposited the check into the **joint savings account she held with the Plaintiff** (Account #2666).

27. In 2006, Defendant Rima Van Hill Seal also pursued a **worker's compensation claim** on the Plaintiff's behalf relating to her father, Bruce Van Hill's death.

28. In her efforts to collect these benefits, the **Plaintiff** signed an agreement on April 22, 2006 to retain Gregory Perigard as an attorney to represent her claim against the City of Alexandria for worker's compensation benefits.  The **Plaintiff** also signed a Virginia

4

Workers' Compensation Commission Claim for Benefits on the same date.  See Exhibits P-11, P-12.

29. On November 17, 2006, Perigard sent a letter to the **Plaintiff** informing her that the **worker's compensation claim** had been settled for **$175,000** and that she must sign a Petition Approving the Compromise Settlement, the Settlement Order, and the Attorney's fee and expense Statement.  The letter also informed the **Plaintiff** that she must sign and notarize an affidavit verifying that she received the settlement benefits. See Exhibit D-27

30. On November 22, 2006, while the **Plaintiff** was home for Thanksgiving, she **signed the affidavit before a notary, verifying that she understood the terms of the settlement. The notary, Jaclyn Van Doran (now Jaclyn Kennelly), testified at her deposition that it was her policy to verify the identity of the signor by asking for a state-issued photo ID**.  See Exhibit D-269, pg. 24-25.

31. On the same date, the **Plaintiff also signed the Attorney's Statement,** requesting a $35,000 attorney's fee (20% of the $175,000 settlement amount) and expense reimbursement in the amount of $72.71.  **She also signed the Petition for Approval**, which Perigard filed with the Virginia Worker's Compensation Commission on November 29, 2006.  See Exhibit D-22.

32. On January 5, 2007, Perigard sent a final letter to the **Plaintiff** enclosing the final order entered by the Virginia Workers' Compensation Commission **confirming that the Plaintiff received her settlement proceeds in the amount of $139,927.29**.  See Exhibit P-9.  This $139,927.29 represented what the Plaintiff was entitled to after Perigard received his $35,000 attorney's fee for representing Plaintiff in her Workers' Compensation claim.  See paragraph 31, *supra*.

33. Defendant Rima Van Hill Seal testified that upon receipt of the settlement proceeds, she **deposited it into the joint savings account she held with the Plaintiff** (Account #2666).

34. On September 6, 2007, during an email exchange relating to the Plaintiff's medical needs, the Plaintiff stated to Defendant Rima Van Hill Seal that she thought they **"already got the money from Virginia."** See Exhibit D-20.

35. Defendant Rima Van Hill Seal testified that over the course of the Plaintiff's time at James Madison University, she **would transfer funds from her and the Plaintiff's joint savings account (#2666) and the Rep-Payee account to accounts the Plaintiff held jointly with Defendant Ron Seal (Accounts #0809 and #4403)**.

36. **The Plaintiff testified that she would use the funds from the #4403 checking account that she held jointly with Defendant Ron Seal for spending money, food, and medicine**.

37. **Defendant Rima Van Hill Seal testified that she would also transfer funds from her and the Plaintiff's joint savings account (#2666) to a joint checking account held between both Defendants Ron and Rima Seal (Account #7832). Ron and Rima Seal would, in turn, use those funds to pay for the Plaintiff's tuition, housing, car payments, and medical bills**.

38. On April 21, 2008, Defendant Rima Van Hill Seal sent an email to the Plaintiff in response to a vitriolic and emotional email from the Plaintiff. In the email, Rima told the Plaintiff that she and Defendant Ron would evaluate the Plaintiff's grades before paying tuition for further classes. Rima Van Hill Seal further stated that the Plaintiff had not

been honest about failing two subjects the prior semester and being kicked off the track

team because of her academic performance. See Exhibit D-66.

39. The Plaintiff testified that her parents "cut off" her access to spending money and the use

of her mother's car in the summer of 2008 after she received poor grades during a fast-

tracked "Maymester" course.  Defendants Ron and Rima Seal testified they did so

because the Plaintiff was not maintaining her grades, lacked financial responsibility, and

was dishonest with the Defendants.

40. In August, 2008, Defendants Ron and Rima sent the Plaintiff another email stating that

they would continue to support her if she made "respect, honesty, responsibility, and

grades a priority."  In exchange for financial support, the Defendants Ron and Rima

demanded that the Plaintiff be "respectful and honest" with them, provide her grades,

commit to maintaining a C in every course, and get a job.  The Plaintiff agreed to the

Defendants terms, and stated that she would also go back to therapy. See Exhibit D-65.

41. The Plaintiff testified that she was admitted to the Emergency Room for a prescription

pill overdose on August 19, 2008.  She then spent 3 days in a mental health inpatient

program.

42. Days later, the Plaintiff discovered that she was pregnant.  As a result, the Plaintiff

dropped out of James Madison University in January 2009.

43. The Plaintiff then moved in with her daughter's father, Louis Corum, in West Virginia.

44. The Plaintiff testified that she worked while Corum attended school.  **However, the
Defendants continued to transfer funds to pay for the Plaintiff's rent, car, medical
treatments, and therapy**. See Exhibits D-226(a), D-77 D-78.

45. In early 2010, the Plaintiff moved back into the Defendant's home at One Palmer Drive, Glen Mills, Pennsylvania, with her daughter (Mariah) because Corum was allegedly abusive. At the time, the Plaintiff was 22 years old.

46. The Plaintiff and Defendants both testified that **the Defendants continued to pay for the Plaintiff's medical costs, car insurance, living expenses, and costs associated with her daughter's care while the Plaintiff lived with them.**

47. In 2011, the Plaintiff moved back to Virginia with her daughter to reside with Louis Corum and his parents.

48. The Plaintiff testified that she became very ill and spent up to three months in the hospital for treatment while living in Virginia. **During this time, Defendants Ron and Rima Seal helped pay for Mariah's care.**

49. In 2012, the Plaintiff moved into an apartment in the Roxborough neighborhood of Philadelphia. **The Defendants continued to provide funds for the Plaintiff's rent, car insurance, child care, and other incidentals.** See Exhibits D-106, D-241.

50. On June 21, 2013, **the Plaintiff sent an email to Defendant Rima Van Hill Seal thanking her for helping out financially and promising that it would only be another month before she could pay her own way**. See Exhibit D-217.

51. **Nevertheless, Defendants Ron and Rima Seal continued to transfer funds to the Plaintiff for rent, car insurance, phone bills, medical costs, child care, and other incidentals.** See Exhibit D-106, D-77.

52. In January 2017, the Plaintiff began dating Third Party Defendant Matthew Pierson.

53. On June 27, 2017, the Plaintiff sent a text message to Defendant Rima Van Hill Seal stating that she had been having problems with her memory. See Exhibit D-81. She said

8

that recently there was 15 minutes when she couldn't remember her own name.  At trial, the Plaintiff testified that she has chronic Lyme disease, and had trouble with her memory in 2017.  She also testified that she once had to pull over in her car because she couldn't remember where she was going.

54. On June 8, 2017, the Plaintiff sent a text message stating that she was having "issues with paranoia," that her "subconscious" was "acting in strange ways," and that she kept crying.  She further stated she was paranoid and was changing her number.  See Exhibit D-80.

55. On July 3, 2017, the Plaintiff and Pierson met Defendants Ron and Rima Seal at the Inner Harbor in Baltimore to spend the night.

56. On July 4, 2017, the Plaintiff and Pierson left Baltimore to go to a party at a friend's house.  The Plaintiff told Defendant Rima that she would stop by the Defendants' house at One Palmer Drive to pick up her daughter's old baby clothes to give to a friend who just had a baby.

57. On the way to the house, the Plaintiff texted her brother, Austin Seal, and told him that they were going to sleep over at the house and not to tell their mother, Defendant Rima Van Hill Seal.  The Plaintiff testified she told him not to tell their mom because the Plaintiff and Pierson had their dog with them, and Defendant Rima Van Hill Seal would not allow their dog in the house.

58. **When the Plaintiff was at the Defendants' house, she entered her mother's office and found file folders containing documents relating to the Plaintiff's Line of Duty benefits and Workers Compensation claim.  The Plaintiff also searched through a trunk in the basement and found pictures of her natural father, Bruce Van Hill, two**

**ledgers and a journal of her mother's.  In the back of the journal was a note to the Plaintiff from her natural father.  The Plaintiff then became "hysterical" and called Pierson.**

59. **Third Party Defendant Pierson then later returned to the house and reviewed the documents that the Plaintiff had taken.**

60. Pierson testified at trial that the Plaintiff had a 104 degree fever and was "delirious" when he arrived at One Palmer Drive that evening.

61. The Plaintiff and Pierson spent the night at One Palmer Drive on July 4, 2017 because the Plaintiff was violently ill.

62. **The Plaintiff and Pierson left the house the following day.  The Plaintiff testified that she took the items the Plaintiff found in the office and trunk.**

63. On July 6, 2017, Defendant Rima sent the Plaintiff several text messages demanding that she immediately bring back the items taken from the house.

64. The Plaintiff testified that the text messages from her mother made her feel threatened, so she filed for a Protection from Abuse order in Delaware County.  At the hearing, the judge issued an order denying the PFA, since the Plaintiff had just spent the weekend with the Defendants.

65. The Plaintiff then contacted the Virginia State Police, the Pennsylvania State Police, the FBI, and the Philadelphia District Attorney, claiming that her parents forged her signature on numerous documents that she discovered in the house.

66. On November 14, 2017, the Plaintiff filed a Complaint against Defendants Ron and Rima Seal alleging forgery, conversion, and unjust enrichment.

67.  On January 17, 2018, Defendants Ron and Rima Seal filed an Answer and Counterclaim against the Plaintiff alleging invasion of privacy, conversion, intentional infliction of emotional distress, wrongful use of civil proceedings, unjust enrichment, and quantum meruit.

68. On January 26, 2018, the Defendants Ron and Rima Seal filed a Joinder Complaint against Third Party Defendant Matthew Pierson also seeking relief for invasion of privacy, conversion, intentional infliction of emotional distress, wrongful use of civil proceedings, unjust enrichment, and quantum meruit.

69. On March 16, 2018, Defendants Ron and Rima Seal filed an Amended Answer, Counterclaim, and Joinder Complaint against both the Plaintiff and Third Party Defendant Matthew Pierson for identity theft.

70. On September 30, 2019, the Defendants Ron and Rima Seal filed an Amended Answer, Counterclaim, and Joinder Claim against both the Plaintiff and Third Party Defendant Matthew Pierson for defamation.

71. At trial, Defendant Ron Seal testified that approximately **$300,000** had been disbursed from the Rep-Payee account and the Defendants' joint accounts with the Plaintiff **as well as from the Defendants' own accounts for the purpose of supporting the Plaintiff since she turned 18 years old**.  See Exhibits D-226(a), D-77 D-78.

## II.     THE COURT WILL FIRST ADDRESS THE PLAINTIFF'S CLAIMS AGAINST DEFENDANTS RON AND RIMA SEAL.

### A. The Plaintiff's Forgery Claim Against Defendants Ron and Rima Seal.

72. The Plaintiff has failed to meet her burden of proof relating to her forgery claim.  In support of her forgery claim, the Plaintiff testified that she did not know about or sign

any of the documents awarding her **Line of Duty, Workman's Compensation, and/or Social Security benefits**.  However, the evidence does not support the Plaintiff's forgery claim for a number of reasons.

a.) **First**, the Defense introduced a report and deposition from an handwriting expert, J. Wright Leonard, documenting that the Plaintiff did sign the Attorney Statement, Affidavit, and Petition for Approval relating to her Worker's Compensation benefits.  See Exhibits D-22, D-257, and D-224.  Although the Plaintiff could have disputed this evidence by presenting her own handwriting expert, she failed to do so.  Having reviewed the evidence that was provided, the Court accepts this evidence as being credible and persuasive.

b.) **Second**, the Plaintiff's Affidavit relating to her Worker's Compensation benefits was notarized by Jaclyn Van Doran (now Jaclyn Kennelly), who testified at her deposition that it was her policy to verify the identity of the signor by asking for a state-issued photo ID.  See Exhibit D-269, Deposition of Jaclyn Kennelly, pg. 24-25.  Hence, Ms. Kennelly's testimony provided both direct and circumstantial evidence that the Plaintiff was in fact the individual who signed the affidavit that Kennelly notarized.  The Court also accepts Kennelly's testimony as being credible and persuasive.

c.) Third, **the Plaintiff** herself **admitted** at trial that she signed the Release of Information Authorization that Officer Kirtley requested in connection with his investigation of her father's Line of Duty benefits.  See Exhibit D-26, P-2.  The Plaintiff also acknowledged and testified that she had the form notarized.  The Court accepts this portion of the Plaintiff's testimony as being credible.  However, although the Plaintiff testified at trial that she thought the Release of Information Authorization form Kirtley

sent her was related to her education at James Madison University, the Court does not

find that portion of her testimony credible since there was other evidence that:  1.) Kirtley

also sent the Plaintiff a letter explaining the purpose of the Release form and its

relationship to the Line of Duty death benefits (see Exhibit D-251), 2.) the Release was

specifically for medical records relating to the Plaintiff's natural father, Bruce Van Hill,

and 3.) the Release also specified that Hill's records were to be submitted to the Virginia

State Police.  Given all of this information, **there was no reason** for the Plaintiff to think

that James Madison University would be interested in her father's medical records or

their submission to the Virginia State Police.

d.) **Fourth**, the evidence established that the Plaintiff sent an email to Defendant Rima

Van Hill Seal on January 17, 2007, confirming that she "**finally spoke to that officer**

**from [Virginia]**." See Exhibit P-20.  Moreover, at trial, the Plaintiff testified and

confirmed that the officer referred to in the email was Officer Kirtley.[1]

e.) **Fifth**, the Plaintiff also testified and confirmed that she sent an email to Defendant

Rima Van Hill Seal on September 7, 2007, stating that she "thought [they] already got the

money from [V]irginia."  See Exhibit D-20.  Although the Plaintiff testified that her

email was referring to the $5,000 scholarship she received towards tuition, the Court does

not find this portion of her testimony credible and persuasive because 1.) her $5,000

scholarship was from the National Law Enforcement and Firefighters Children's

Foundation in New York and had no relationship to Virginia, and 2.) the Plaintiff had

already lost her National Law Enforcement and Firefighters Children's Foundation

---

[1] Since Officer Kirtley's sole purpose in speaking with the Plaintiff was to investigate her eligibility for the Line of Duty benefits, this suggests that the Plaintiff was in fact aware of the benefits.

Scholarship at the time of the September 7th email since she did not maintain her grade point average.  See Exhibit D-227.

f.) **Sixth**, the evidence established that the Plaintiff was copied on a May 3, 2006 email Defendant Rima had sent to Connie Jones[2] discussing the availability of the Line of Duty death benefits. See Exhibit D-16.

g.) **Seventh**, the Plaintiff testified and confirmed at trial that **she was aware of her joint savings account with Defendant Rima Van Hill Seal (#2666), her joint savings account with Defendant Ron Seal (#0809), and her joint checking account with Defendant Ron Seal (#4403)**.  The Court accepts this portion of the Plaintiff's testimony as credible and persuasive.

h.) **Eighth**, Defendant Rima Van Hill Seal testified that she and the Plaintiff discussed the Plaintiff's Social Security Survivorship benefits.  Furthermore, the evidence established that the Plaintiff was required to sign an entitlement form and have her high school confirm her graduation date to receive the benefits.

i.) **Ninth**, while Defendant Rima deposited the Social Security checks herself into a Rep-Payee Account[3] (#4770), **there is insufficient evidence that she forged any documents relating to them or deceived the Plaintiff in any way.  Moreover, there is insufficient evidence that either Defendant Ron or Rima Seal used these funds for any purpose other than for the Plaintiff's benefit.**

---

[2] Connie Jones was an employee at the Commonwealth of Virginia Department of Accounts that Defendant Rima had contacted regarding the availability of benefits relating to the death of the Plaintiff's natural father, Bruce Van Hill.

[3] A representative payee is appointed by the Social Security Administration to manage the benefits of a beneficiary.

14

73. Under the law, "an essential element of forgery, whether in a civil or criminal context, is the intent to defraud." <u>Mellon Bank, N.A. v. Holub</u>, 583 A.2d 1157, 1160 (Pa. Super. 1990).

74. Moreover, "a party who relies on fraud to establish a claim has the burden of proving by clear and convincing evidence the facts upon which the alleged fraud is based." <u>Laughlin v. McConnel</u>, 191 A.2d 921, 923 (Pa. Super. 1963). Fraud is "never presumed." <u>Id</u>.

75. **Keeping these principles in mind, the Plaintiff has presented insufficient evidence that the Defendants intended to defraud her. On the contrary, the evidence suggests that all funds from Social Security, Workers' Compensation, and the Line of Duty Benefits were deposited into accounts that the Plaintiff controlled as joint account holder or benefitted from as beneficiary. Moreover, there is insufficient evidence that the Defendants fraudulently deprived her of those funds or that the Plaintiff failed to benefit from them.** For these reasons, the Plaintiff's Forgery claim is **DENIED**.

**B. The Plaintiff's First Conversion Claim Relating To Her Worker's Compensation, Line of Duty, and Social Security Benefits.**

76. The Plaintiff also failed to meet her burden of proof supporting her first conversion claim.

77. Under the law, conversion is "the deprivation of another's right of property in, or use or possession of, a chattel, or other interference therewith, without the owner's consent and without lawful justification." <u>Stevenson v. Economy Bank of Ambridge</u>, 197 A.2d 721, 726 (Pa. 1964).

15

78. A conversion may be committed in several ways, including: "(a) Acquiring possession of the goods, with an intent to **assert a right** to them which is in fact **adverse** to that of the owner. (b) Transferring the goods in a manner which deprives the owner of control. (c) Unreasonably withholding possession from one who has the right to it. (d) Seriously damaging or misusing the chattel in defiance of the owner's rights." Norriton East Realty Corp. v. Central-Penn Nat. Bank, 254 A.2d 637, 638 (Pa. 1969) (emphasis added).

79. **However,** "not every destruction or deprivation of property amounts to a conversion; there **must** be an actual appropriation of it by the offending party **for his own use**." Chrysler Credit Corp. v. Smith, 643 A.2d 1098, 1100 (Pa. Super. 1994) (emphasis added).

80. When turning to the evidence, the Court notes that, upon receipt of the **Virginia Worker's Compensation settlement** on January 5, 2007, Defendant Rima Van Hill Seal deposited the funds totaling **$139,927.29** into a **joint savings account held between Defendant Rima Van Hill Seal and the Plaintiff (#2666). As evident from her signatures on the Affidavit, Petition for Approval, and Attorney Statement, the Plaintiff was aware of this settlement**. The Plaintiff also testified at trial that she was **aware of the joint savings account** (#2666) she held with Defendant Rima Van Hill Seal. **Since the Plaintiff knew of, had access to, and never protested the use of the joint accounts, she was not deprived of use, possession, or control of these funds.**

81. Upon further review of the evidence, the Court finds that Defendant Rima Van Hill Seal deposited the **Line of Duty benefits** (received on January 30, 2007) totaling **$25,000** into the **joint savings account** held between Defendant Rima and the Plaintiff (#2666). **As evident from her signature on the notarized Authorization for Release of**

16

Information form, the email copied to the Plaintiff relating to the Line of Duty

Benefits (Exhibit D-16), and the emails between Defendant Rima and the Plaintiff

discussing Officer Kirtley and the "Alexandria stuff" (Exhibit P-20), it is clear that

the Plaintiff was also aware of the Line of Duty benefits.  Moreover, the Plaintiff

testified and confirmed that she was **aware of the joint savings account** (#2666) she

held with Defendant Rima Van Hill Seal.  **Since the Plaintiff knew of and had access to**

**the account, she was not deprived of use, possession, or control of the funds –**

especially when the evidence suggests that she was aware that the Defendants were

apparently spending some of these and other funds for her benefit.

82. The evidence further established that Defendant Rima Van Hill Seal deposited the **Social**

**Security benefits** (amounting to around $6,684) into a **Rep-Payee account** (#4770) that

named the Plaintiff as the beneficiary.  **Defendant Rima Van Hill Seal testified that she**

**spoke with the Plaintiff about these Social Security benefits, but the Plaintiff claims**

**she did not know about this account or about the benefits**.

83. **However, although the Plaintiff may have arguably been "deprived of control" over**

**the Social Security funds by virtue of not having actual knowledge of the Rep-Payee**

**account, she has failed to demonstrate that the Defendants actually appropriated the**

**funds for their own use.  The main reason is that the Defendants testified that funds**

**were drawn upon from the Rep-Payee account for the purpose of paying for the**

**Plaintiff's various expenses.**  Defendant Rima testified that she would often transfer

funds from her and the Plaintiff's joint savings account (#2666) and the Rep-Payee

Account (#4770) into Rima and Ron Seal's joint checking account (#7832).  However,

both Defendants Rima and Ron also testified that these transfers were made so that they

could disburse funds as needed for the Plaintiff's expenses, such as tuition and medical costs.

84. Although the Defendants conceded that the Plaintiff's funds were commingled with theirs, **they testified that the total amount was always "earmarked" for the Plaintiff.[4]**

85. More compellingly, the Plaintiff, herself, testified and confirmed that the **Defendants would frequently transfer funds to her to pay for her expenses**.

86. **Given the evidence, the Court finds this portion of the testimonies of both Defendants and the Plaintiff to be credible and persuasive.**

87. **In conclusion, the Court finds that the Plaintiff has not established that the Defendants intended to assert a right to the Social Security benefits that was adverse to the Plaintiff. Moreover, the Plaintiff failed to demonstrate that the Defendants appropriated the Social Security benefits for their own use, and has not convincingly shown that they were doing so without her knowledge or consent.**

88. **In making this determination, the Court distinguishes our facts from those in** Sternlicht v. Sternlicht, 822 A.2d 732 (Pa. Super. 2003). In Sternlicht, a father who **used funds from his child's** Uniform Gift to Minor Account **to purchase a house in his own name** was found liable for conversion. In that case, the father clearly converted the funds **by asserting a right to them that was adverse to that of his child**. In our case, there is insufficient evidence that the Defendants asserted a right to the funds adverse to the Plaintiff.

---

[4] See e.g. Tenco Excavating, Inc. v. First Sealord Sur., Inc., 78 A.3d 1181, 1186 (Cmwlth. Ct. 2013) ("if the fiduciary has a choice of withdrawing from a commingled account either converted funds or legitimate funds, it will be presumed that he withdrew legitimate funds).

89. **Since the Plaintiff has not met her burden of proof demonstrating that she was deprived of use, possession, or control of her Worker's Compensation, Line of Duty, or Social Security benefits, and cannot demonstrate that the Defendants actually misappropriated those funds ($172,725.29) for their own use, the Plaintiff's first Conversion claim is DENIED.**

## C. The Plaintiff's Second Conversion Claim Relating to the Uniform Gift to Minors Account with Morgan Stanley and the PA 529 College Savings Plan.

*i.) The Uniform Gift to Minor Account (UGMA) with Morgan Stanley.*

90. The Plaintiff also claims that, as the named beneficiary of the **Morgan Stanley UGMA Account** (#0423), she is entitled to the **$71,602** that was removed from the account in November 2001. She further alleges that the Defendants Ron and Rima Seal also converted these funds for their benefit.  See Exhibit P-18.

91. The Plaintiff was a minor (between 12 and 17 years old) between the time the Morgan Stanley Account was opened in June 2000 and December 2004.

92. Under the law, the custodian of a Uniform Gift to Minor Account has a duty to use the account for the minor's benefit. Sternlicht, 822 A.2d at 740 [citing Sutliff v. Sutliff, 528 A.2d 1318, 1323 (Pa. 1987)].

93. Moreover, "a custodian may…expend for the minor's benefit so much of the custodial property as the custodian considers advisable for the use and benefit of the minor, without court order and without regard to:  (1) the duty or ability of the custodian personally or of any other person to support the minor; or (2) any other income or property of the minor which may be applicable for that purpose. 20 Pa.C.S. § 5314(a).

94. **According to the evidence, Defendant Rima Van Hill Seal was the custodian for the account**, and had statutory authority to expend funds in the UGMA Account for the Plaintiff's benefit.

95. A key piece of evidence that the Plaintiff presented in support of her conversion claim relating to the UGMA money was an inaccurate certification of incomplete and out-of-order account statements.

96. At trial, the Plaintiff introduced a certification from Morgan Stanley documenting that its records custodian certified that the records presented contained Uniform Gift to Minor Account statements from July 2000 to November 2001. See Exhibit P-22. However, these **statements were out of order, incomplete, and included statements from months not mentioned in the certification**. For example, the records included a statement from June 2000, but did not include statements from August, October, or November of 2000, or February, April, May, July, or August of 2001.

97. Moreover, another certification from Morgan Stanley in the Plaintiff's exhibits purportedly documented statements from "March 2001 through December 2004." See Exhibit P-18. However, these records were also out of order and only contained the statements included in the later certification mentioned in paragraph 96 of these Findings, *supra* (Exhibit P-22). Finally, there were no statements for the years 2002, 2003, or 2004.

98. At trial, Arthur Czabka, a records custodian for Morgan Stanley, testified that account statements withdrawn from a computer would normally produce records in chronological order.

99. The Plaintiff points to the **November 2001** account statement (Exhibit P-22), showing

that the funds in the account totaling **$71,602** were paid out by check on November 20,

2001, and showing an account balance of $0 at the end of that month.

100.    It should also be noted that the Plaintiff provided the Defendants with Morgan

Stanley **UGMA statements for November and December 2004. The November 2004**

**statement, in particular, shows an account balance of $3.23.** See Exhibit D-265.

101.    This evidence suggests that **the UGMA account was active between November**

**2001 and November 2004, and that funds appear to have been deposited into this**

**account during this timeframe.** However, although the Plaintiff may be implying that

this $3.23 represents interest, such an argument is unpersuasive since an account with a

"0" balance would not accumulate interest.

102.    The Court further notes that UGMA account statements were not produced by the

Plaintiff for the years of 2002, 2003, and January through October of 2004, and **the**

**Plaintiff's 2006 tax return shows a capital loss of $3,000 for that year with an**

**additional capital loss of $12,227 carried over from previous years**. See Exhibits D-

264, D-265.  **As the UGMA account reflects the Plaintiff's only known assets for**

**2000 through 2005, the Plaintiff's tax return suggests that the funds that were in the**

**UGMA account may have also been capital losses.**

103.    Although the Plaintiff alleges that the Defendants converted the **$71,602** for their

own use when the funds were withdrawn, **she, again, offers no dispositive evidence to**

**support this claim.** These funds may have been poorly reinvested in the stock market,

resulting in capital losses to the Plaintiff, or they may have been used to pay for the

Plaintiff's private school tuition at Padua academy. **Regardless, the use of these funds**

were arguably within Defendant Rima's custodial authority pursuant to 20 Pa.C.S.
§ 5314(a).

104.    **The Court notes that it is also possible that the Defendants may have actually
converted the funds.  However, the Court does not have sufficient evidence to
determine what happened to the money in the UGMA account.**

105.    **Given the totality of the circumstances, a single account statement showing
that a single large withdrawal had been made in November 2001 is not sufficient
evidence, in and of itself, for a reasonable factfinder to conclude that the custodian
of the account converted the funds for her own use – especially when one considers
that the Defendants were continually disbursing funds to the Plaintiff for her
expenses.  Therefore, the Plaintiff failed to meet her burden of proof supporting her
conversion claim relating to the UGMA funds.**

*ii.) The PA 529 College Savings Plan.*

106.    The Plaintiff also claims that the Defendants converted the funds in the **PA 529
College Savings Plan** when they changed the beneficiary from the Plaintiff to her
brother, Austin.

107.    Unlike a Uniform Gift to Minors Account, **funds within a 529 account do not
constitute a "gift" already given to the beneficiary** of the account.  The owners of a
529 account are not "custodians" of the account, but rather own the funds outright and
retain the authority to change the beneficiary of the account.

108.    Therefore, the Plaintiff was not deprived of her right to the funds in the 529
account because **she did not actually have a right to the funds in the 529 account**.

22

109.    In summary, since the Plaintiff cannot show that the Defendants appropriated the

funds in the UGMA account for their own use, nor that she was deprived of her right to

the funds in the 529 account, **her second Conversion claim is DENIED**.

**D. The Plaintiff's Claim that the Defendants Were Unjustly Enriched in the Amount of**
**$172,725.29 because the Defendants Retained the Benefit of the Workers Compensation,**
**Line of Duty, and Social Security Benefits.**

110.    The Plaintiff has failed to meet her burden of proof relating to her unjust

enrichment claim.

111.    Unjust enrichment is an equitable doctrine, whose elements are:  (1) benefits

being conferred on the defendant by the plaintiff, (2) the appreciation of such benefits by

the defendant, and (3) the acceptance and retention of such benefits under such

circumstances that it would be inequitable for the defendant to retain the benefit without

payment of value. Schenk v. K.E. David, Ltd., 666 A.2d 327, 328 (Pa. Super. 1995).

112.    As previously described in paragraphs 35-37 of these Findings, *supra*, the

Defendants used her Workman's Compensation, Line of Duty, and Social Security

benefits to pay for the Plaintiff's tuition, rent, vehicle, medical costs, food, and other

expenses.

113.    Moreover, after these funds were expended, the Defendants Ron and Rima Seal

continued to pay for the Plaintiff's expenses on a regular basis.

114.    For example, Defendant Ron Seal testified that he and Defendant Rima Van Hill

Seal spent over **$300,000** on the Plaintiff between 2006 and 2018 (after she turned 18).

See Exhibit D-226(a).  The Worker's Compensation, Line of Duty, and Social Security

benefits totaled $172,725.29.  Therefore, the evidence suggests that the **Defendants**

spent over $125,000 of their own money to pay for the Plaintiff's expenses once her

benefits were depleted. There was no evidence presented by the Plaintiff that

contradicted or refuted Defendant Ron Seal's testimony.

115.     **Upon further examination, the Plaintiff offered insufficient evidence to show**

**that she conferred a benefit on the Defendants. On the contrary, financial**

**disbursement records and the Plaintiff's own testimony at trial corroborated that**

**the Defendants paid a considerable amount of her expenses over many years.** See

Exhibits D-77, D-78, D-226(a).

116.     However, even if the Defendants briefly commingled the Plaintiff's funds with

their own in a joint account, and the Plaintiff believes that such commingling conferred a

benefit upon the Defendants, there is insufficient evidence that the Defendants

**appreciated that benefit.** For one thing, Defendant Rima Van Hill Seal testified that the

**$165,000** from Workman's Compensation and Line of Duty payments deposited into the

joint account was always "**earmarked**" for the Plaintiff. More importantly, all of these

funds appear to have been spent on the Plaintiff's expenses.

117.     **Since the Plaintiff cannot show that a benefit was conferred on the**

**Defendants, nor that the Defendants appreciated any such benefit, her unjust**

**enrichment claim is DENIED.**

**III.     THE COURT WILL NOW ADDRESS THE DEFENDANTS RON AND RIMA**

**SEAL'S COUNTERCLAIMS AGAINST THE PLAINTIFF.**

**A. The Defendants' First Counterclaim against the Plaintiff for Invasion of Privacy.**

118.     An action for invasion of privacy is comprised of four distinct torts: (1) intrusion

upon seclusion, (2) appropriation of name or likeness, (3) publicity given to private life,

and (4) publicity placing the person in a false light. <u>Harris by Harris v. Easton Pub Co.</u>,

483 A.2d 1377, 1383 (Pa. Super. 1984).

i.) The Defendants allege that the Plaintiff intruded upon seclusion, gave publicity

to their private life, and published the Defendants in a false light.

ii.) One is subject to liability for intrusion upon seclusion if they (1) intentionally

intrude, (2) upon the solitude or seclusion of another or his private affairs or concerns, (3)

where the intrusion would be highly offensive to a reasonable person. <u>Id</u>.

iii.) One is subject to liability for giving publicity to private life if they (1) publish

(2) private facts (3) which would be highly offensive to a reasonable person, and (4) are

not of legitimate concern to the public. <u>Id</u>. at 1384.

iv.) One is subject to liability for publicly placing another in a false light if they

(1) publish (2) a matter concerning another (3) that places the other in a false light, where

(4) the false light would be highly offensive to a reasonable person, and (5) the publisher

had knowledge of or acted in reckless disregard as to the falsity of the publicized matter

and the false light in which the other would be placed. <u>Larsen v. Philadelphia</u>

<u>Newspapers, Inc.</u> 543 A.2d 1181, 1188 (Pa. Super. 1988).

119.    **In the case at bar, the Plaintiff testified that she searched through a trunk**

**filled with mementos from Defendant Rima Van Hill Seal's life in the basement of**

**One Palmer Drive, where she found two ledgers and a journal belonging to**

**Defendant Rima.  She further testified that she read the ledgers and journal which**

**contained information relating to Defendant Rima's private life.**

120.    Reading the private journals, diaries, or memoirs of another without permission

would be highly offensive to any person.  Since the Plaintiff intentionally read each one

25

of the ledgers and the journal, which were secluded in a trunk among other private

mementos, **she is liable to the Defendants for invasion of privacy by means of**

**intrusion upon seclusion**.

121.     Moreover, there was evidence that the Plaintiff **recklessly published false**

**information** about the Defendants in the following ways:

(a) Stating to the FBI that Defendant Rima's employer, Avistar, was a fake

company (see Exhibit D-15 pg. 3, 5),

(b) Stating to her brother that Defendant Ron had opened a line of credit in her

name (see Exhibit D-102 pg. 1),

(c) Stating to "Gary Vasquez" and/or "Hope Jenke" that the Defendants had

stolen her identity, transferred money sent to her into their own accounts, and

stolen money from other organizations, (see Exhibit D-15, pg. 9-10),

(d)  Stating to "Karen Snow" and/or "Arthur Lynch" that Defendant Rima forged

signatures (see Exhibit D-52)

(e)  Stating on social media that the person with her "blood" who "gave" her the

name Simone stole her identity (see Exhibit D-99),

(f) Texting another person that the Defendants would be charged with

conspiracy, that Defendant Rima was hacking into her emails, and that

Defendants' bank accounts were frozen because they had admitted guilt (see

Exhibit D-102),

(g) Stating on social media that the Defendants stole her identity, forged

signatures, and stole hundreds of thousands of dollars (see Exhibit D-196),

and

26

(h) Stating to her daughter Mariah, the Defendants granddaughter, that

~~Defendants had lied and stolen money from her.~~

122.    Any one of these statements would be highly offensive to a reasonable person. Therefore, the Plaintiff is further liable for **invasion of privacy by means of false light**.

123.    In an action for **invasion of privacy, the fact that a claimant did not suffer pecuniary loss nor physical harm is irrelevant.  Damages, whether nominal, compensatory, or punitive can be awarded in the same way that general damages are given for defamation**. Aquino v. Bulletin Co., 154 A.2d 422, 426 (Pa. Super. 1959).

124.    "Injury to reputation, impairment of standing in the community, personal humiliation and mental anguish are types of actual harm "not limited to out-of-pocket loss" compensable for defamation." Pilchesky v. Gatelli, 12 A.3d 430, 444 (Pa. Super. 2011).  See also Gertz v. Robert Welch, Inc., 418 U.S. 323, 350 (1974).

125.    Given the reckless nature of the false light publications committed by the Plaintiff, injury to the Defendants' reputation, standing in the community, and the personal humiliation (i.e. embarrassment) brought upon the Defendants as a result, the Defendants' claim of Invasion of Privacy against the Plaintiff is GRANTED.  However, the Court has taken note that this case involves extenuating familial circumstances, given the history of the case.  Therefore, **the Court awards damages to the Defendants, Ron and Rima Seal, and against the Plaintiff, Simone Seal, in the amount of $2,000.**[5]

**B. The Defendants' Second Counterclaim against the Plaintiff for Identity Theft.**

126.    In their Answer to Plaintiff's Second Amended Complaint with New Matter, Counterclaim and Joinder Claim, filed September 30, 2019, the Defendants allege that

---

[5] The Plaintiff is ordered to pay $1,000 to Defendant Ron Seal and $1,000 to Defendant Rima Van Hill Seal.

the Plaintiff used the Defendants' personal information to open a credit card and other accounts, attempted to log onto and change usernames and passwords on various accounts.

127.    However, the Court finds that the Defendants presented insufficient evidence at trial for it to make a finding relating to this claim.

128.    Consequently, **the Defendants' Identity Theft claim against the Plaintiff is DENIED**.

**C. The Defendants' Third Counterclaim against the Plaintiff for Conversion.**

129.    The Defendants alleged that the Plaintiff removed a diamond wedding and engagement ring from their home at One Palmer Drive.

130.    Even though the Defendants were not present, the Plaintiff admitted at trial to removing multiple documents from the house, including private ledgers, journals, calendars, et cetera, owned by Defendant Rima.

131.    However, the only evidence presented at trial confirming the existence of rings was the Defendants' testimony, and **they presented no evidence confirming the value of the rings**.

132.    Since **the Plaintiff admitted** at trial that she improperly deprived Defendant Rima Van Hill Seal of her right to possess the documents without her consent, the Court finds that the Plaintiff converted Rima's property.  However, since the Court is unable to ascertain the value of the converted documents, **nominal damages are awarded to the Defendants Ron and Rima Seal and against the Plaintiff Simone Seal in the amount of \$2.[6]  The Plaintiff is further ORDERED to return all items she took from One**

---

[6] The Plaintiff is ordered to pay \$1 to Defendant Ron Seal and \$1 to Defendant Rima Van Hill Seal.

**Palmer Drive on July 4, 2017 to the Defendants within 30 days of this order or face
more severe Court sanctions for her failure to comply with the Court's order.**

**D. The Defendants' Fourth Counterclaim against the Plaintiff for Intentional Infliction
of Emotional Distress.**

133.     Recovery for intentional infliction of emotion distress is limited to those cases
wherein competent medical evidence of emotional distress is presented by the claimant.
Gray v. Huntzinger, 147 A.3d 924, 929 (Pa. Super. 2019) [citing Kazatsky v. King David
Memorial Park, Inc., 527 A.2d 988, 995 (Pa. 1987)].  See also Cassell v. Lancaster
Mennonite Conference, 834 A.2d 1185, 1189 (Pa. Super. 2003) ("Expert medical
testimony is necessary to establish that a plaintiff actually suffered the claimed emotional
distress.").

134.     No expert medical testimony was presented at trial, nor was any expert medical
report admitted confirming any emotional distress suffered by the Defendants.

135.     Therefore, **the Defendants claim for Intentional Infliction of Emotional
Distress against the Plaintiff is DENIED**.

**E. The Defendants' Fifth Counterclaim against the Plaintiff for Wrongful Use of Civil
Proceedings.**

136.     A person who takes part in the procurement, initiation, or continuation of civil
proceedings against another is subject to liability to the other if (1) he acts in a grossly
negligent manner or without probable cause and primarily for a purpose other than that of
securing the proper discovery, joinder of parties, or adjudication of the claim in which
proceedings are based, and (2) the proceedings have terminated in favor of the person

against who they are brought. <u>Hart v. O'Malley</u>, 647 A.2d 542, 546-547 (Pa. Super.
1994) (citing 42 Pa.C.S § 8351).

137.     On July 7, 2017, the Plaintiff procured a Protection from Abuse Order in
Delaware County.  See Exhibit D-96.

138.     On July 13, 2017, the Protection from Abuse Order was dismissed in Defendant
Rima Van Hill Seal's favor after the hearing.  The Plaintiff testified that the judge did not
believe a PFA was warranted, given that the Plaintiff spent time with the Defendants in
Baltimore just the previous week.

139.     Although the proceedings terminated in Defendant Rima's favor, given the
circumstances of this case, the Court finds that the Defendants have presented insufficient
evidence to support this cause of action.

140.     Moreover, the Plaintiff testified at trial that she felt that the PFA was necessary
because she had "altercations" with her mother before.  There is insufficient evidence that
the Plaintiff was pursuing the order for any purpose other than its adjudication.

141.     Since the Defendants failed to prove that the Plaintiff was acting with an ulterior
purpose when obtaining the PFA, their **claim of Wrongful Use of Civil Proceedings
against the Plaintiff is DENIED**.

**F. The Defendants' Sixth Counterclaim against the Plaintiff that She Was Unjustly
Enriched.**

142.     To sustain an unjust enrichment claim, a claimant must show that the party
against whom recovery is sought either wrongfully secured or passively received a
benefit that it would be unconscionable for them to retain.  <u>Gutteridge v. J3 Energy
Group, Inc.</u>, 165 A.3d 908, 917 (Pa. Super. 2017).  **However**, the doctrine does not apply

30

simply because a party benefited as a result of the claimant's actions. Id. Whether the

doctrine applies depends on the particular factual circumstances of the case at issue.

143.    In this case, two parents have a claim against their adult daughter for the full

amount of money they spent to support her after she reached the age of majority.

144.    Over the past 14 years, the Defendants have paid, at varying times, for the

Plaintiff's rent, medical costs, food, vehicle costs, clothing, child care costs, and many

other expenses out of their own pocket.

145.    It is not uncommon for parents to financially support their adult children for a

time after they reach adulthood when they are unable to support themselves.

146.    There is a presumption in Pennsylvania that services are gratuitous in nature

between persons in a familial relationship.  See Mitchell v. Moore, 729 A.2d 1200, 1204

(Pa. Super. 1998) ("it has been said, an intention to pay for work done will be assumed,

except in the case of parent and child").

147.    The evidence reflects that there were many instances over the past 14 years where

the Plaintiff said she would pay the Defendants back for their support.  However, aside

from the Defendants' testimony, there is no evidence that the Defendants actually

expected to be paid back, especially considering their daughter's financial circumstances

and habits.  Moreover, there is no evidence that the Plaintiff ever repaid the Defendants

for any support, nor that she actually intended to.

148.    Furthermore, the intentions of the parties are inconsequential.  The Courts have

held that "in determining if the doctrine applies, our focus is not on the intentions of the

parties, but rather on whether the [Plaintiff] has been unjustly enriched." Schenk v. K.E.

David, Ltd., 666 A.2d 327, 328 (Pa. Super. 1995).

149.      The Court does not find an adult child's retention of financial support from their parents to be "unconscionable."

150.      Since the Defendants failed to demonstrate that the Plaintiff's retention of financial support from her parents was "unconscionable," the **Defendants' unjust enrichment claim against the Plaintiff to recover all financial support is DENIED**.

**G. The Defendants' Seventh Counterclaim against the Plaintiff for Unjust Enrichment under Quantum Meruit.**

151.      "Quantum meruit is an equitable remedy[, which] is defined as 'as much as deserved' and measures compensation under an implied contract to pay compensation as reasonable value of services rendered." Meyer, Darragh, Buckler, Bebenek & Eck, LLC v. Law Firm of Malone Middleman, PC, 95 A.3d 893, 896 (Pa. Super. 2014).

152.      As stated previously in paragraphs 143-146, *supra*, the Defendants paid for a considerable amount of the Plaintiff's expenses out of their own pocket.  These expenses included rent, medical expenses, food, vehicle costs, child care costs, et cetera.  However, while the Plaintiff often promised to pay back the Defendants, there was insufficient evidence that the Defendants actually expected to be paid back, considering their daughter's financial circumstances and habits.  Moreover, there is no evidence that the Plaintiff ever repaid the Defendants for any support, nor that she actually intended to.

153.      Services between family members are presumed to be gratuitous.  See Mitchell, 729 A.2d at 1204, *supra*.

154.      Therefore, the Court finds that there is insufficient evidence to impose an implied contract upon the parties, and consequently the **Defendants' quantum meruit claim against the Plaintiff is DENIED**.

**H. The Defendants' Final Counterclaim against the Plaintiff for Defamation.**

155.    The Defendants did not raise a claim for defamation against the Plaintiff until September 30, 2019.

156.    The statute of limitations for defamation claims is one year.  42 Pa.C.S. § 5523.

157.    No evidence was presented at trial, testimonial or otherwise, of any defamatory statement made by the Plaintiff after September 30, 2018.

158.    Therefore, **Defendants' final claim of defamation against the Plaintiff is DENIED**.

IV.    **THE COURT WILL NOW ADDRESS THE DEFENDANTS RON AND RIMA SEAL'S JOINDER CLAIMS AGAINST THIRD PARTY DEFENDANT MATTHEW PIERSON.**

**A. The Defendants' First Joinder Claim against Pierson for Invasion of Privacy.**

159.    The Defendants allege that Pierson intruded upon seclusion, gave publicity to their private life, and published the Defendants in a false light.

160.    As stated previously, one is subject to liability for publicly placing another in a false light if they (1) publish (2) a matter concerning another (3) **that places the other in a false light**, where (4) the false light would be highly offensive to a reasonable person, and (5) the publisher had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed. Larsen v. Philadelphia Newspapers, Inc. 543 A.2d 1181, 1188 (Pa. Super. 1988).

161.    Pierson testified at trial that he read most, if not all, of the documents that the Plaintiff removed from Defendant Rima's office and from the basement of One Palmer Drive.

162.    Pierson also testified that he is a high school teacher.  As a teacher, he is an educated man who should understand the consequences of his actions.

163.    After reading the documents removed from the Defendants' home, Pierson recklessly published false information about the Defendants in the following ways:

(a)    stating to the Plaintiff's daughter's father, **Louis Corum**, that Defendant Rima kidnapped the Plaintiff when she was a child, that the Plaintiff's natural father was "dead within three weeks of a kidnapping case being filed," that the Defendants were under investigation by the District Attorney and the Federal Bureau of Investigation, that they would be tried "soon" and be imprisoned for life, and that the Defendants intended to kidnap the Plaintiff's daughter, Mariah (see Exhibit D-93),

(b)    stating to the Defendants' son, **Austin**, that the Defendants were "going down" and that Defendant Rima took money from the Plaintiff (see Exhibit D-86),

(c)    stating to **Kristin Formosa** (Defendant Ron Seal's niece) that a District Attorney in Virginia was gathering evidence against the Defendants and were using this matter to bring charges, that Defendant Rima had committed financial crimes, and that Defendant Ron committed tax fraud (see Exhibit D-89),

(d)    stating to Defendant **Ron Seal** that Defendant Rima conspired to have Bruce Van Hill (the Plaintiff's natural father) murdered (see Exhibit D-91),

(e)    stating to **Louis Corum** that Defendant Rima defrauded the Plaintiff out of millions of dollars, that Defendant Rima "beat the shit out of" the Plaintiff, and

that the Plaintiff had a Protection From Abuse Order in place against the

Defendants (see Exhibit D-94), and

(f)    stating to **Mariah**, the Defendant's granddaughter, that the Defendants

had lied to her mother, and stolen money from her.

164.    Any one of these statements would be highly offensive to a reasonable person,

and consequently Pierson is liable to the Defendants for **invasion of privacy by means**

**of false light**.

165.    As previously stated, the fact that a claimant did not suffer pecuniary loss nor

physical harm is irrelevant.  Damages, whether nominal, compensatory, or punitive can

be awarded in the same way that general damages are given for defamation. Aquino v.

Bulletin Co., 154 A.2d 422, 426 (Pa. Super. 1959).  "Injury to reputation, impairment of

standing in the community, personal humiliation and mental anguish are types of actual

harm "not limited to out-of-pocket loss" compensable for defamation." Pilchesky v.

Gatelli, 12 A.3d 430, 444 (Pa. Super. 2011).  See also Gertz v. Robert Welch, Inc., 418

U.S. 323, 350 (1974).

166.    Given the reckless nature of the false light publications committed by Pierson and

the injuries the Defendant's sustained to their reputation, standing in the community, and

their personal humiliation (i.e. embarrassment), the **Defendants' claim of Invasion of**

**Privacy against Pierson is GRANTED, and damages are awarded to the Defendants,**

**Ron and Rima Seal, and against the Third Party Defendant, Matthew Pierson, in**

**the amount of $6,000.  More specifically, Defendant Pierson shall pay Defendants**

**Ron and Rima Seal $3,000 each, for a total amount of $6,000.**

**B. The Defendants' Second Joinder Claim against Pierson for Identity Theft.**

167.     In their Answer to Plaintiff's Second Amended Complaint with New Matter, Counterclaim and Joinder Claim, filed September 30, 2019, the Defendants allege that Pierson used the Defendants' personal information to open a credit card and other accounts.  The Defendants further allege that Pierson attempted to log onto and change usernames and passwords on various accounts.

168.     However, the Defendants presented insufficient evidence at trial for the Court to make a finding relating to this claim.

169.     As a result, **the Defendants' identity theft claim against Pierson is DENIED**.

**C. The Defendants' Third Joinder Claim against Pierson for Conversion.**

170.     The Defendants alleged that Pierson removed a diamond wedding and engagement ring from their home at One Palmer Drive.

171.     The only evidence presented at trial relating to the existence or value of these rings was the Defendants' testimony.  Moreover, the Defendants were not present when the Plaintiff removed documents from the house, although Plaintiff admitted at trial that she removed the documents from Rima's office and basement at One Palmer Drive.  These documents included Rima's private ledgers, journals, calendars, et cetera.

172.     In light of the facts, since the evidence suggests that Pierson himself did not deprive the Defendants of these items, **the Defendants' Conversion claim against Pierson is DENIED**.

**D. The Defendants' Fourth Joinder Claim against Pierson for Intentional Infliction of Emotional Distress.**

173.    As previously stated, Recovery for intentional infliction of emotion distress is limited to those cases wherein competent medical evidence of emotional distress is presented by the claimant. <u>Gray v. Huntzinger</u>, 147 A.3d 924, 929 (Pa. Super. 2019), *supra.*

174.    No expert medical reports or testimony was presented at trial confirming any emotional distress suffered by the Defendants.

175.    Consequently, **the Defendants' claim of Intentional Infliction of Emotional Distress against the Pierson is DENIED**.

**E. The Defendants' Fifth Joinder Claim against Pierson for Wrongful Use of Civil Proceedings.**

176.    A person who takes part in the procurement, initiation, or continuation of civil proceedings against another is subject to liability to the other if (1) he acts in a grossly negligent manner or without probable cause and primarily for a purpose other than that of securing the proper discovery, joinder of parties, or adjudication of the claim in which proceedings are based, and (2) the proceedings have terminated in favor of the person against who they are brought. <u>Hart v. O'Malley</u>, 647 A.2d 542, 546-547 (Pa. Super. 1994) (citing 42 Pa.C.S § 8351).

177.    It is unclear from the trial evidence to what extent Pierson helped to procure the Protection from Abuse order.

37

178.  Nevertheless, even if Pierson were involved in the process, there is no evidence that he participated for any purpose other than helping the Plaintiff adjudicate her concerns relating to her parents.

179.  Therefore, **the Defendants claim of Wrongful Use of Civil Proceedings against Pierson is DENIED**.

**F. The Defendants' Sixth and Seventh Joinder Claims against Pierson for Unjust Enrichment.**

180.  To sustain a claim of unjust enrichment, a claimant must show that the party against whom recovery is sought either wrongfully secured or passively received a benefit that it would be unconscionable for them to retain.  Gutteridge v. J3 Energy Group, Inc., 165 A.3d 908, 917 (Pa. Super. 2017).  **However, the doctrine does not apply simply because a party benefited as a result of the claimant's actions**.  Id. Rather, the doctrine depends on the particular factual circumstances of the case at hand.

181.  In this case, the Defendants are seeking incidental benefits Pierson reaped when they provided financial support to the Plaintiff.  However, the evidence is unclear to what degree Pierson benefitted from the financial support the Defendants gave to their daughter.

182.  Although Pierson was the guest recipient of several dinners and hotel rooms that the Defendants may have financed, it would be unreasonable for the Court to require Pierson to reimburse the Defendants for any gifts simply because the relationship between the Defendants and the Plaintiff has unfortunately deteriorated.

183.  Furthermore, the Court finds that Pierson was not unjustly enriched merely because he occasionally drove the Plaintiff's vehicle.  Although Defendant Ron Seal was

making payments on the Plaintiff's car, this constituted a quasi-contract with the Plaintiff, not Pierson.  That the Plaintiff allowed Pierson to use *her* car for a time did not transfer liability.  Rather, Pierson was the beneficiary of the Plaintiff's benevolence, and any benefit that he received as a result of Defendant Ron's payments was merely incidental.

184.      Consequently, **the Defendants' claims of unjust enrichment against Pierson are DENIED**.

**G. The Defendants' Final Joinder Claim against Pierson for Defamation.**

185.      The Defendants did not raise a claim for defamation against Pierson until September 30, 2019.

186.      The statute of limitations for defamation claims is one year.  42 Pa.C.S. § 5523.

187.      There was no evidence was presented at trial, testimonial or otherwise, of any defamatory statement made by Pierson after September 30, 2018.

188.      Therefore, Defendants' final claim of defamation against the Pierson is DENIED.


                                        **BY THE COURT:**


DATE: _June 8, 2020_          _____
                              **HONORABLE GLYNNIS D. HILL**